******************************************************

The "officially released" date that appears near the be-
ginning of each opinion is the date the opinion will be pub-
lished in the Connecticut Law Journal or the date it was
released as a slip opinion. The operative date for the be-
ginning of all time periods for filing postopinion motions
and petitions for certification is the "officially released"
date appearing in the opinion.

All opinions are subject to modification and technical
correction prior to official publication in the Connecticut
Reports and Connecticut Appellate Reports. In the event of
discrepancies between the advance release version of an
opinion and the latest version appearing in the Connecticut
Law Journal and subsequently in the Connecticut Reports
or Connecticut Appellate Reports, the latest version is to
be considered authoritative.

The syllabus and procedural history accompanying the
opinion as it appears in the Connecticut Law Journal and
bound volumes of official reports are copyrighted by the
Secretary of the State, State of Connecticut, and may not
be reproduced and distributed without the express written
permission of the Commission on Official Legal Publica-
tions, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* TONY ESPINAL
## (AC 41554)

Alvord, Cradle and Suarez, Js.

*Syllabus*

Convicted of the crime of manslaughter in the second degree as a result of the stabbing death of the victim, the defendant appealed to this court, claiming, inter alia, that he was deprived of his right to present a defense when the trial court precluded certain evidence he claimed was vital to his defense of self-defense. The defendant had stabbed the victim during an altercation on a highway exit ramp after the automobiles they were driving had collided. The defendant called 911 on his cell phone during the altercation but did not explain his situation to the dispatcher until he made a second 911 call after he was able to leave the victim and drive to another location. The trial court precluded the defendant from introducing evidence that, at the time of the altercation, a rearrest warrant had been issued for the victim in connection with pending motor vehicle violations against him. The defendant claimed that the victim was the initial aggressor and was motivated to attack him because he thought the defendant was talking on the cell phone to the police during the altercation and wanted to avoid an encounter with the police. The trial court also precluded the defendant from introducing into evidence as spontaneous utterances under § 8-3 (2) of the Connecticut Code of Evidence statements he made in his second 911 call and in a videotaped interview with the police when they told him that the victim had died. *Held*:

1. The defendant could not prevail on his claims that the trial court incorrectly determined that evidence of the victim's rearrest warrant was irrelevant and unduly prejudicial, and that his second 911 call and portions of his interview with the police did not constitute spontaneous utterances under § 8-3 (2):

   a. The rearrest warrant and evidence of the victim's prior motor vehicle violations did not have a logical tendency to support a finding by the jury, as the defendant claimed, that the victim had a motive to be the initial aggressor, as it was not logical to infer that a person seeking to avoid the police following his involvement in a minor automobile accident would initiate a physical altercation in a public place with a person he believed to be summoning the police on a cell phone; moreover, evidence that the victim was an unlicensed driver who had an outstanding warrant for operating a motor vehicle while his driving privileges were suspended was unduly prejudicial in that it clearly portrayed him in a negative light and was likely to arouse the emotions of the jurors, and the exclusion of the proffered evidence did not deprive the defendant of his right to present a defense, as he was adequately able to present his claim of self-defense by way of his own testimony, by cross-examination of the state's witnesses, and through the opportunity to present other relevant and admissible evidence; furthermore, the court's ruling did not substantially affect the jury's verdict so as to constitute harmful evidentiary error, the state having presented a strong case and disproved the defense of self-defense beyond a reasonable doubt, and there was no dispute that the defendant and the victim engaged in a physical altercation in which the defendant used a knife and that the victim died of a stab wound.

   b. The defendant's claim that the recording of his second 911 call was admissible under § 8-3 (2) was unavailing, the trial court having reasonably found that the call was not made in such close connection to the altercation with the victim as to negate the opportunity for deliberation and fabrication: despite the defendant's belief that the second 911 call was a spontaneous utterance because it was made minutes after his first 911 call ended, it was eminently reasonable to infer that, by the time the defendant made the second call, he was aware of the seriousness of his predicament and that his statements to the 911 dispatcher could have serious consequences for him; moreover, the facts suggested that, after the defendant drove away from the scene of the altercation, he made the second call from a location of relative calm, where he no

longer expected to encounter the victim and made factual statements concerning the altercation that were consistent with statements he made during the first 911 call; furthermore, because the court's evidentiary ruling did not reflect an abuse of discretion, the defendant could not prevail on the unpreserved constitutional aspect of his claim in which he asserted that the court's ruling infringed on his right to present a defense.

c. The undisputed circumstances surrounding the defendant's interview with the police amply supported the trial court's finding that his reaction to news of the victim's death did not constitute a spontaneous utterance: contrary to the defendant's contention that the startling event at issue was his learning from the police that the victim had died, the court properly considered the startling event at issue to be the altercation on the exit ramp many hours before the defendant's interview with the police, as the defendant had a lengthy opportunity to contemplate his predicament and craft a response to avoid prosecution, and was well aware that he was at police headquarters, was a suspect in a criminal case and that any statements he made concerning the altercation would likely affect his penal interest; moreover, the defendant's response to news of the victim's death was a self-serving expression of disbelief, which was analogous to a denial of culpability and consistent with his assertions to the police that he did not stab the victim in the chest, and, even if the defendant had been startled by news of the victim's death, his reaction was relevant to an assessment of his conduct during the altercation, including whether he caused the victim's death; furthermore, because the court properly precluded the admission of the interview on evidentiary grounds, the defendant could not prevail on the unpreserved constitutional aspect of his claim, in which he asserted that the court's ruling infringed on his right to present a defense.

2. The defendant's unpreserved claim that the trial court improperly instructed the jury as to the order of its deliberations and misled it as to the consequences of a finding that he acted in self-defense was unavailing: despite the defendant's contention that the jury could not have considered the lesser included offenses at issue if it found him not guilty of a greater offense on the basis of his defense of self-defense, it was not reasonably possible that the jury was misled, as the court's instructions led the jury to a correct understanding that self-defense was a complete defense to murder, the crime with which the defendant had been charged, and the lesser included offenses at issue, the court instructed the jury that it had to evaluate the defense of self-defense before returning a verdict with respect to any of the offenses, and it instructed the jury that it was required to return a verdict of not guilty if it found that the state failed to disprove the defense of self-defense; moreover, although the jury was not instructed that the state's failure to disprove the defense of self-defense beyond a reasonable doubt required it to find the defendant not guilty of murder and all of the lesser included offenses at issue, the defendant's interpretation of the jury charge was belied by the court's repetitive and unambiguous instructions that conveyed the applicability of the defense of self-defense to every offense at issue, as well as the legal significance of a finding that the state failed to disprove the defense of self-defense; accordingly, the defendant failed to demonstrate that a constitutional violation existed that deprived him of a fair trial.

3. This court declined to exercise its supervisory authority over the administration of justice to require trial courts to instruct juries to consider the defense of self-defense prior to considering whether the defendant is guilty of the charged offense and any lesser included offenses, the defendant having failed to persuade this court that the procedure followed by the trial court in instructing the jury infringed on the integrity of the trial or the perceived fairness of the judicial system as a whole.

Argued January 5—officially released November 2, 2021

*Procedural History*

Substitute information charging the defendant with the crime of murder, brought to the Superior Court in the judicial district of Fairfield and tried to the jury before *Pavia, J.*; verdict and judgment of guilty of the lesser included offense of manslaughter in the second degree, from which the defendant appealed. *Affirmed.*

*Pamela S. Nagy*, assistant public defender, for the appellant (defendant).

*Robert J. Scheinblum*, senior assistant state's attorney, with whom, on the brief, were *Joseph T. Corradino*, state's attorney, and *C. Robert Satti*, *Jr.*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

SUAREZ, J. The defendant, Tony Espinal, appeals from the judgment of conviction, rendered following a jury trial, of manslaughter in the second degree in violation of General Statutes § 53a-56 (a) (1).[1] The defendant claims that (1) the trial court deprived him of his due process rights to present a defense and to a fair trial by precluding him from introducing evidence that was vital to his defense, (2) the court committed error with respect to its jury instructions concerning the defense of self-defense, and (3) this court, in the exercise of its supervisory authority over the administration of justice, should require trial courts, in cases in which self-defense is asserted as a defense, to instruct juries to consider the defense prior to considering whether the defendant is guilty of the charged offense and any lesser included offenses. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. On December 18, 2014, the defendant was living in Bridgeport with his parents and his girlfriend at that time, Nefertiti Green. That day, the defendant worked from 7 a.m. to 2 p.m. at a restaurant. The defendant then worked at his second job, from 4 to 11 p.m., at a different restaurant that was located in Trumbull. Between approximately 10 and 11 p.m., the defendant, while at the restaurant, consumed two beers with some of his coworkers. By the time the defendant left the restaurant at approximately 11 p.m., he felt as though he had been through "a very tough day," he was tired, and he wanted to get home.

In the parking lot of the restaurant, the defendant got into his automobile, which was registered to Green. He called Green on his cell phone to let her know that he was on his way home. The defendant continued his conversation with Green as he drove away from the restaurant and proceeded along Route 25, a multilane state highway, toward Bridgeport.

As the defendant approached southbound exit 5 of Route 25, he and the victim, Bryant Kelly, were involved in a minor automobile collision. Thereafter, on exit 5, both drivers stopped their automobiles within several feet of each other. Before the defendant exited his automobile, he concealed a Swiss Army type knife in the pocket of his pants. Once they had exited their automobiles, the defendant and the victim began cursing and shouting at one another, and their encounter quickly escalated into a physical altercation. At no point did the victim display a weapon. The defendant reached into his pocket, opened his knife with his thumb, and used it to inflict multiple injuries to the victim. These injuries included multiple superficial wounds on the victim's arm, as well as a fatal wound that resulted

from the defendant stabbing the victim in the left chest, thereby piercing the victim's left lung cavity, a major coronary artery, and his heart. Then, the defendant got back into his automobile and drove away from the scene.

At some point during his encounter with the victim on the exit ramp, the defendant ended his phone conversation with Green and used his cell phone to call 911. Although the defendant was connected to the 911 dispatcher for several minutes during his encounter with the victim, he did not explain his situation to the dispatcher until after he had driven away from the exit ramp. He informed the dispatcher that he would stop and wait for the police at the intersection of Lindley Street and Salem Street in Bridgeport. After the defendant ended his initial conversation with the dispatcher but before the police arrived, he concealed his knife under a spare tire in the trunk of his automobile. For approximately twenty minutes, the defendant waited for the police to arrive. As the defendant did so, he called 911 a second time and was speaking with a 911 dispatcher when the police arrived.

During the course of his two conversations with a 911 dispatcher, the defendant did not state that he had been in fear for his life or that he had used a knife during his encounter with the victim. When the police, including Trooper Edmund Vayan of the state police, arrived at the defendant's location at the intersection of Lindley Street and Salem Street, they spoke with the defendant. Vayan noticed that the defendant was outside of his automobile holding a cell phone in his left hand. He also observed blood on the defendant's right hand. Despite the fact that the defendant saw the police searching his automobile, he did not immediately inform the police about the knife he had concealed in the trunk. Later, when Vayan asked the defendant if there was a knife in his automobile, he hesitated before responding that there was a knife in his trunk. The police later recovered the knife. The defendant voluntarily accompanied the police to the state police Troop G barracks in Bridgeport, where he was advised of his rights. Thereafter, the police interviewed him for several hours and obtained a written statement from him.

At trial, the defendant asserted that he had acted in self-defense. The defendant testified that, while he and the victim were operating separate automobiles in the southbound lanes of Route 25, prior to reaching exit 5, the victim passed him on his right side and "clipped" his front bumper. Once the victim's automobile was in front of the defendant's automobile, the defendant flashed his headlamps. Thereafter, the victim and the defendant were driving side-by-side in the southbound lanes. The victim began yelling and gesturing at the defendant. Then, the victim drove his automobile such

that it was directly in front of the defendant's automobile, and the victim then slammed on his brakes, causing another minor collision with the defendant. Both drivers stopped their automobiles on exit 5. The victim, who was larger than the defendant, exited his automobile and approached the defendant. Because the victim was angry, cursing, and yelling, the defendant put a knife in his pocket. The defendant, while still talking to Green on his cell phone, exited his automobile, and he began to inspect the damage to the automobile when the victim pushed him. The defendant told the victim not to touch him, and he used his cell phone to take a photograph of the victim's license plate. The victim pushed him onto the hood of the defendant's automobile. At this point, the defendant called 911.

The defendant testified that, after the victim pushed him this second time, he got up and told the victim "not to put your hands on me, not to touch me." The victim and the defendant exchanged insults, and the victim told the defendant, "I'm in your face. Put your hands up so I can knock you out." The victim and the defendant continued to yell at each other. The victim turned as though he was going to leave but then surprised the defendant by punching him in the jaw. The victim then started pushing the defendant even more, grabbing his sweatshirt and, in the defendant's words, "throwing [him] around." The defendant testified that, as other drivers were passing them on the exit ramp, he believed that the victim was either trying to throw him on the ground or into oncoming traffic. The defendant screamed, "let me go," several times, but the victim would not comply. Fearing for his life, the defendant reached into his pocket with his right hand and brandished his knife.

According to the defendant, he swung the knife twice "on [the victim's] shoulder" while intending to cause the victim to let go of him. The defendant testified that he did not know if he struck the victim with the knife, but it was possible that it may have made contact with the victim's arm. The defendant also testified that, although he made a "short swing" with the knife in the direction of the victim's shoulder, at no point did he push the knife straight at the victim's body. The defendant testified that he "never stabbed [the victim] in the chest."

The defendant testified that, after he used the knife, the victim released him and stated, "you have a knife, I'll show you what I have in my car." As the victim turned and walked toward his automobile, the defendant got into his automobile, drove around the victim's automobile, and proceeded to the intersection of Lindley Street and Salem Street, where he waited for the police. The defendant called 911 during his encounter with the victim on the exit ramp, and he had his cell phone in his left hand during a portion of his encounter with the

victim. It was not until the defendant drove away from the victim, however, that he was able to converse with the 911 dispatcher. The defendant testified that, while he was waiting for the police to arrive, he opened the trunk, and "threw [the knife] in there [and] closed the trunk." Additional facts will be set forth as necessary.

## I

First, the defendant claims that, in three instances, the court deprived him of his due process rights to present a defense and to a fair trial by precluding him from introducing evidence that was vital to his defense. He claims that the court improperly precluded him from introducing evidence that was highly relevant to his claim of self-defense, including (1) evidence that, at the time of the encounter, the victim had an active rearrest warrant for motor vehicle violations and was driving while his right to operate a motor vehicle was suspended, (2) a recording of a phone call that the defendant made to 911 within minutes after his encounter with the victim ended, and (3) a portion of his videotaped interview by the police at Troop G following the events at issue, which depicted his reaction upon being informed by the police that the victim had died. We disagree with these claims and will address them in turn.

We begin by setting forth legal principles common to the issues raised in this claim. "The sixth amendment right to compulsory process includes the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies. . . . Although we recognize that the right of a defendant to present a defense is subject to appropriate supervision by the trial court in accordance with established rules of procedure and evidence . . . we are also mindful that the fair opportunity to establish a defense is a fundamental element of due process . . . and that our rules should not be applied mechanistically so as to restrict unreasonably that important right." (Citation omitted; internal quotation marks omitted.) *State* v. *DeCaro*, 252 Conn. 229, 256, 745 A.2d 800 (2000). "A [criminal] defendant has a constitutional right to present a defense, but he is [nonetheless] bound by the rules of evidence in presenting a defense. . . . Although exclusionary rules of evidence cannot be applied mechanistically to deprive a defendant of his rights, the constitution does not require that a defendant be permitted to present every piece of evidence he wishes. . . . Accordingly, [i]f the proffered evidence is not relevant [or is otherwise inadmissible], the defendant's right to [present a defense] is not affected, and the evidence was properly excluded. . . . Thus, the question of the admissibility of the proffered evidence is one of evidentiary, but not constitutional, dimension."

(Citations omitted; internal quotation marks omitted.) *State* v. *Mark T.*, Conn. , , A.3d (2021). "We first review the trial court's evidentiary rulings, if premised on a correct view of the law . . . for an abuse of discretion. . . . If, after reviewing the trial court's evidentiary rulings, we conclude that the trial court properly excluded the proffered evidence, then the defendant's constitutional claims necessarily fail." (Internal quotation marks omitted.) *State* v. *David N.J.*, 301 Conn. 122, 133, 19 A.3d 646 (2011).

A

The defendant claims that the court improperly excluded evidence that, at the time of the encounter, the victim had an active rearrest warrant for motor vehicle violations and was driving while his right to operate a motor vehicle was suspended. We disagree.

The following additional facts and procedural history are relevant to this claim. On November 28, 2017, prior to the beginning of the defendant's case-in-chief and outside the presence of the jury, defense counsel informed the court as follows: "[W]e have evidence that the [victim], as of the date of this incident, was not only in under suspension status [with regard to his right to operate a motor vehicle in Connecticut], he actually was in a rearrest status having to do with . . . operating under suspension. In fact, the evidence that we would proffer is that he didn't have a Connecticut license, and his right to operate in Connecticut was under suspension. I don't know . . . if he ever had [a license]. . . . [W]e have someone from [the Department of Motor Vehicles (department)] who would be offering that evidence. And I would submit that it is, when combined with the evidence that . . . [the defendant] has already committed to by way of his rather lengthy [police] interview, namely, that the [victim] . . . got more and more upset about [the defendant] having . . . his phone and seemingly making a phone call. And that's, to a large extent, precipitated . . . the further aggravation of hostilities by [the victim].

"So, it would relate to motive . . . as in someone who is . . . in a status of that they are not . . . not only not supposed to be driving a car, but they have a pending operating under suspension in rearrest status . . . supporting the reasonable inference that [the victim] would be particularly not interested in having the police involved in what was otherwise a very, very minor fender bender.

"[The defendant] described to the police that it was his intention to get the police involved [after the accident occurred] . . . just, basically, settle it, file whatever reports are necessary and deal with it that way. He did provide evidence to the police that he, in fact, took a photograph of [the victim's] license plate while out there. . . . And part of the time line that . . . the

state provided to the defense . . . [was that the defendant was] on the phone with one person, terminating that call, taking the photograph, and initiating the call with the Connecticut state police.

"And so . . . the jurors, applying common sense, should be permitted to consider whether or not an individual in that status of a pending [operating] under suspension, while in a suspended status, with an outstanding warrant for not appearing under his suspension, whether that person, in fact, would be motivated to not want the police involved. That would be the relevance of it, and we're prepared to proffer . . . a recordkeeper from [the department who] will be prepared to testify regarding status and [the victim's] right to operate as of the date of the . . . [altercation involving the defendant and the victim]. I think I would separately need to either seek judicial notice at another time . . . in relation to [the victim's] rearrest status in connection with what was . . . then pending, so the rearrest warrant, operating under suspension."

The prosecutor responded that, even if it were assumed that the defendant would testify in a manner consistent with defense counsel's representations, he objected to the evidence on the ground that it was inadmissible character evidence.

Defense counsel made an offer of proof by means of the testimony of Brian Clarke, a program coordinator employed by the department. Clarke testified that, as of December 18, 2014, the victim's driving privileges were under suspension as a result of his having received an infraction ticket in 2009 for driving without a license. According to Clarke, the victim's driving privileges were suspended in approximately October, 2010. Clarke also testified that the department's records reflected that the victim never had a valid driver's license, but that nondriver identification cards had been issued to him. Clarke testified that the mailing address the department had for the victim was in Bridgeport. The court deferred ruling on the admissibility of the evidence.

The next day, November 29, 2017, the defendant submitted a request for judicial notice pursuant to § 2-1 of the Connecticut Code of Evidence. The defendant asked the court to instruct the jury that, "[o]n December 18, 2014, the [victim] . . . had an outstanding rearrest warrant stemming from a matter [in the Superior Court] in New Haven, [geographical area number twenty-three], that was issued on August 12, 2014. The underlying charges were illegal operation motor vehicle under suspension in violation of [General Statutes §] 14-215, operating unregistered motor vehicle in violation of [General Statutes §] 14-12 (a), and failure to use seat belt in violation of [General Statutes §] 14-100a (c) (1)." The defendant attached to his request documents from the Judicial Branch website, reflecting that, in August, 2014, a rearrest warrant had been issued for "failure to

appear," and that, in December, 2014, there were pending charges against the victim for, inter alia, operating a motor vehicle while under suspension.

Although the record does not reflect that the state filed a motion in limine with respect to the evidence at issue, on November 30, 2017, defense counsel filed a memorandum of law in response to what he characterized as the state's "motion in limine" to preclude the defendant from introducing evidence concerning the victim's status, as a result of his motor vehicle offenses, at the time of the incident. Defense counsel argued therein that evidence that the victim "was facing the potential consequence of incarceration as a result of operating a motor vehicle at the time of the incident" was relevant to demonstrating why the victim attacked the defendant, whom he believed to be in the process of summoning the police to the accident scene. Attached to this memorandum was the state's information in the 2014 case brought against the victim, a summons, a rearrest warrant application for the victim that was granted on August 14, 2014, and a motion filed by the victim on November 19, 2014, to vacate the rearrest warrant, which was denied on November 20, 2014.[2] The court did not rule on the admissibility of the evidence at that time.

During the defendant's testimony on November 29, 2017, he testified in relevant part that, following two minor automobile collisions caused by the victim, he and the victim stopped their automobiles on exit 5 of Route 25. Following the first minor collision, before stopping on the exit ramp, the victim acted aggressively toward the defendant by "yelling and gesturing" at him. When the defendant exited his automobile on the exit ramp, he was using his cell phone to converse with Green. The victim commented on the fact that the defendant was using his cell phone. Specifically, the victim asked the defendant if he was speaking with the police. The defendant testified that he simply replied, "not to worry about that." According to the defendant, the victim thereafter assaulted him several times, and he used his knife to repel the victim because he feared for his life.

On November 30, 2017, the court revisited the evidentiary issue raised by the defendant. Initially, the court identified what it believed to be defense counsel's theory of admissibility, namely, that the proffered evidence about the victim's outstanding arrest warrant made it reasonable to infer that the victim was in a "state of turmoil" and acted angrily toward the defendant because he believed that the defendant either had or would summon the police to the accident scene. The court stated that there was no direct evidence that the victim asked the defendant *not* to call the police because he feared being arrested but understood the defendant's argument to rest on the inference to be

drawn from the proffered evidence that the victim knew there was a rearrest warrant and that the existence of such warrant would lead to his arrest if the police arrived at the accident scene.

In its consideration of the proffered evidence, the court observed that the victim had listed a West Haven address on his motion to vacate the rearrest warrant. It then expressed its concern that, because Clarke testified that the department only had the victim's Bridgeport address on file, and it was reasonable to presume that any notices in the case would have been sent to the address on file, "[w]e have no idea whether [the victim] knew or was informed or received any notice with regard to [his status after the court's denial of his motion to vacate the rearrest warrant]."

Defense counsel downplayed the significance of the fact that there was no evidence that the victim had received notice of the court's ruling on the motion to vacate the rearrest warrant. Defense counsel responded that the fact that the victim filed the motion to vacate the rearrest warrant was itself sufficient evidence to demonstrate that he knew that he had "a pending case," he was "under suspension," he should not be driving an automobile, and he was subject to rearrest. Although defense counsel argued that the jury reasonably could infer that the victim did not want to encounter the police following the accident because he did not have an operator's license, it was the goal of the defense to present evidence "that [the victim had] an outstanding arrest warrant." Defense counsel argued that, in the absence of any evidence that the victim had received notice of the court's denial of the motion to vacate the rearrest warrant, the court should not presume that the victim somehow believed that his motion had been granted and that he was not subject to arrest.

The state responded that, in essence, the defendant was attempting to introduce character evidence of the victim to prove something that was not a material issue in the case, namely, the victim's motive for behaving in an angry and agitated manner toward the defendant. The state argued that there was no legal basis to admit this character evidence under § 4-4 of the Connecticut Code of Evidence. The state also asserted that the evidence, which was prejudicial, did not have any probative value in light of the fact that there was no evidence that the victim had notice that his motion to vacate had been denied and his warrant was still outstanding. The state also posited that, in light of the defendant's testimony that, before the victim had asked him if he had called the police, the victim and the defendant were engaged in a heated verbal exchange, the logical inference for which defense counsel sought to introduce the evidence was weak, at best. Stated otherwise, the state argued that the defendant's own testimony showed that the victim was agitated and angry prior to the time that

he may have believed that the defendant was using his cell phone to summon the police.

Defense counsel responded by drawing an analogy between the evidence he sought to introduce and evidence that is admitted to prove consciousness of guilt of an accused. He argued that the jury could infer that someone who has an outstanding arrest warrant for operating while under suspension would be concerned if, at the scene of an accident, he observed the other driver with a cell phone in his hand. He also asserted that it was reasonable for the victim to infer that the defendant was calling the police. Defense counsel also stated his belief that the defendant's testimony, which was that the victim had asked him if he was on the phone with the police, supported counsel's theory of admissibility.

The court once again deferred ruling on the issue but, nonetheless, responded to defense counsel that, if his theory of admissibility rested on the fact that the victim was motivated to avoid the police at the scene of the accident, the defendant's testimony undermined this theory. The court explained that the defendant's testimony showed that "[the victim is] not an individual that's trying to get in his car and get out of there. He's an individual who's standing his ground and fighting, which is almost the opposite of what you're saying. There's no suggestion that he's trying to get out of there and get away from the police. So, I understand what you're trying to get in, but it also needs to be supported by the facts of this particular case."

The following day, the court disallowed the proffered evidence by means of an oral ruling. The court stated that "the evidence that the defense is seeking, based upon the record of this particular trial, would really be, one, pure speculation; two, not supported by the evidence; and, three, more prejudicial than probative. So, in this court's opinion, putting in evidence of the decedent's arrest record or warrants for arrest or underlying charges really do[es] not support anything that the defendant indicated in terms of his version. . . . I know the defense position, that [the victim] is referencing the fact that he has a phone out. Even by the defendant's own testimony, all he says is that he had this phone out, that it's out while he's looking at damage to his car, that, at some point, the . . . decedent says to him something to the effect of, are you on the phone, or, are you talking to the police, and the defendant indicates not to worry about it, never says that the decedent is angry or yelling at him or there's any type of . . . behavior that supports what the defendant's argument is in this particular instance, which is that the decedent was so irate about the idea of the police possibly finding him, that that propelled him into some form of aggressive behavior toward the defendant.

"The . . . court's position is that, as I indicated yes-

terday, it's almost the opposite would be true because the evidence would be that the decedent would be trying to get away from the situation, as opposed to continuing to stay there knowing that the police were most likely going to be coming. And so I think, one, it's not supported by the case law; two, it's not supported by the facts of this particular case; three, it's pure speculation; and four, it's . . . more prejudicial than it is probative."

At the conclusion of the court's ruling, defense counsel clarified that the proffered evidence was not merely relevant with respect to the victim's motive, but that it impacted the defendant's self-defense claim. Defense counsel stated that the proffered evidence may have had only slight probative value, but that it was for the jury, not the court, to determine the strength of the inferences to be drawn from it. The court responded: "[M]y ruling has, kind of, several layers to it. So, the first is that it's not supported by the case law, that, in terms of the decedent and his background and criminal record or behavioral patterns or character in a self-defense case, as I think we can all agree, this is, at this point, certainly there are times when that comes in. But in this instance, I think, we . . . all agree that that's not what the defense is seeking to put it in for. You're not trying to put it in toward a showing of the decedent's aggressive behavior. . . .

"[T]he other segment is, well, is it relevant to this particular case and the facts of this particular case. And . . . after reviewing again everything that the defendant has said, the court's position is that it is not. Now, having said that, I did not prevent, and I am not preventing . . . the defendant testifying to or any recitation by the defendant of what he believes was occurring, what he experienced and all of those things remain on the record. And the defendant and the defense obviously has an opportunity to argue that point to the jury and to ask the jury to draw any inference that they would like to. I am simply ruling that the admission of an outstanding arrest warrant that was pending against the decedent is not admissible at this time."

Having discussed the court's ruling, we turn to the applicable legal principles. We observe that the court's ruling is based primarily on its conclusion that, in light of the facts of this particular case, the proffered evidence was not relevant. The Connecticut Code of Evidence provides that " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence." Conn. Code Evid. § 4-1. Section 4-2 of the code provides that, unless there is a legal basis for its exclusion, "[a]ll relevant evidence is admissible . . . ." Conn. Code Evid. § 4-2. "Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact

is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, [as] long as it is not prejudicial . . . ." (Internal quotation marks omitted.) *State* v. *Bonner*, 290 Conn. 468, 497, 964 A.2d 73 (2009). "The [trial] court has the discretion to exclude speculative evidence, expert or otherwise." *Message Center Management, Inc.* v. *Shell Oil Products Co.*, 85 Conn. App. 401, 421, 857 A.2d 936 (2004); see also *State* v. *Isabelle*, 107 Conn. App. 597, 607, 946 A.2d 266 (2008) ("[i]t is a reasonable exercise of judicial discretion to exclude . . . evidence the relevancy of which appears to be so slight and inconsequential that to admit it would distract attention which should be concentrated on vital issues of the case" (internal quotation marks omitted)).

Preliminarily, the defendant argues that, when a defendant claims to have acted in self-defense, "evidence of the victim's motive to attack the defendant is relevant." In support of this proposition, the defendant relies heavily on this court's analysis in *State* v. *Thomas*, 110 Conn. App. 708, 955 A.2d 1222, cert. denied, 289 Conn. 952, 961 A.2d 418 (2008). In *Thomas*, the defendant, who was charged with assault, raised the defense of self-defense. Id., 713. In furtherance of her claim of self-defense, the defendant attempted to demonstrate at her criminal trial that the alleged victim was the initial aggressor and that the victim's motive in assaulting the defendant was that she wanted to prevent the defendant from conveying certain information to the defendant's boyfriend about the victim's " 'illegitimate child' . . . ." Id., 714; see also id., 717. The trial court disallowed the evidence on the ground of relevance. See id., 715.

The defendant in *Thomas* appealed to this court, claiming in relevant part that the trial court violated her constitutional right to present a defense by precluding her from presenting evidence that the victim had a motive to act as the aggressor. Id., 713. This court concluded "that the [trial] court improperly excluded evidence relevant to [the victim's] alleged motive to attack the defendant. Because the defendant raised the defense of self-defense at trial, the determination of whether [the victim] or the defendant was the initial aggressor was material. . . . Although the proffered evidence may have strained credulity, it tended to corroborate the defendant's assertion that [the victim] initially attacked her because it tended to show that [the victim] had a motive to attack the defendant to prevent her from relaying information about [the victim's] child to [the alleged father of the child, the defendant's boyfriend]. To be relevant, the evidence need not exclude all other possibilities; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight

degree. . . . The odd nature of the offer does not detract from its ability to support the conclusion for which it was offered. Accordingly, we conclude that the evidence was relevant and that its exclusion constituted an abuse of the court's discretion." (Citations omitted; internal quotation marks omitted.) Id., 717. This court, however, went on to conclude that the trial court's ruling did not rise to the level of a constitutional violation because it did not foreclose an entire defense theory. See id., 718. This court also concluded that the ruling was not harmful because the exclusion of the evidence did not substantially affect the verdict. See id., 719.

In the present case, the defendant also argues that the evidence at issue "was highly relevant to show that [the victim] had a motive for attacking the defendant. Just as in *Thomas*, the evidence corroborated the defendant's claims of self-defense and that [the victim] became aggressive because he thought the defendant was talking to the police. It certainly is reasonable to infer that this belief triggered [the victim's] aggression because he knew there was a warrant for his arrest and he had no driver's license." The defendant also argues that, pursuant to § 4-5 (c) of the Connecticut Code of Evidence, evidence of a person's other crimes is admissible to prove motive and that there was an evidentiary basis to admit the evidence in light of the defendant's testimony about the victim's statements to him at the scene of the crime after the victim observed the defendant using his cell phone.

We agree with the defendant that, because he raised the defense of self-defense, the issue of whether he or the victim was the aggressor was a material issue of fact for the jury's consideration in evaluating whether his use of physical force was justified under the circumstances. General Statutes § 53a-19 (a), which delineates the defense of self-defense, provides: "Except as provided in subsections (b) and (c) of this section, a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm." See also *State* v. *Thomas*, supra, 110 Conn. App. 717. The issue in the present case may be distilled to whether the proffered evidence had a *logical tendency*, even to a slight degree, to support a finding that the victim was the initial aggressor.

Even if we assume, in the absence of any evidence that the victim knew that the court had denied his motion to vacate the rearrest warrant, that the victim

was aware of an outstanding warrant for operating under suspension at the time of the accident, the proffered evidence does not logically tend to support the proposition for which it was introduced. Consistent with the defendant's view of the evidence, there was an evidentiary basis on which to conclude that the victim was under the belief that the defendant had summoned the police. The defendant testified that, after his automobile and the victim's automobile collided, the two men stopped their automobiles on the exit ramp. The defendant exited his automobile while on his cell phone. He used the cell phone to take a photograph of the victim's license plate. When the victim observed this conduct, he inquired whether the defendant had called the police, something that would be reasonable to presume in the immediate aftermath of an automobile accident that, as the defendant maintained, was caused by the victim. The defendant responded coyly, "not to worry about it." This vague response reasonably could have been interpreted by the victim as an affirmation that the police were on their way.

We agree with the court, however, that the proffered evidence tended to undermine the purpose for which it was introduced. The defendant argued that the evidence gave the victim a strong motive to be the initial aggressor to prevent detection by the police. If the victim wanted to avoid the police and evade arrest, it is reasonable to infer that he either would have not stopped his automobile on the exit ramp or that he would have fled the scene once he observed the defendant on his cell phone. The defendant testified unambiguously, however, that neither of these things occurred. It is not logical to infer that a person seeking to avoid the police following his involvement in a minor automobile accident would initiate a physical altercation, in a very public place, with a person he believed to be actively speaking with or summoning the police. Nothing in the defendant's testimony suggests that the victim acted in such a manner as to distance himself from the police when they arrived at the accident scene. Thus, we agree with the trial court's assessment that the evidence did not have a logical tendency, even to a slight degree, to support the proposition for which it was introduced. As a result, it was not relevant for the purpose for which it was introduced.

The court also concluded that the evidence was unduly prejudicial. The defendant challenges this aspect of the court's ruling in a cursory manner, simply arguing that there was "no merit to the court's finding that the evidence was prejudicial." The Connecticut Code of Evidence provides that "[r]elevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice . . . ." Conn. Code Evid. § 4-3. This court has described the familiar analysis to determine undue prejudice as follows: "Of course, [a]ll adverse evidence is damaging to one's case, but it

is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jur[ors]. . . . The trial court . . . must determine whether the adverse impact of the challenged evidence outweighs its probative value. . . . Finally, [t]he trial court's discretionary determination that the probative value of evidence is not outweighed by its prejudicial effect will not be disturbed on appeal unless a clear abuse of discretion is shown. . . . [B]ecause of the difficulties inherent in this balancing process . . . every reasonable presumption should be given in favor of the trial court's ruling. . . . Reversal is required only [when] an abuse of discretion is manifest or [when] injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Dillard*, 132 Conn. App. 414, 425–26, 31 A.3d 880 (2011), cert. denied, 303 Conn. 932, 36 A.3d 694 (2012).

In the present case, it was the state, not the defendant, that argued that the evidence was unduly prejudicial to the state's case. In light of our conclusion that the proffered evidence did not have any probative value with respect to the material issue for which it was offered, namely, whether the victim was the initial aggressor, we have little difficulty agreeing with the court that evidence that the victim was an unlicensed driver and that he had an outstanding warrant for operating under suspension was unduly prejudicial. Such evidence clearly portrayed the victim in a negative light and was likely to arouse the emotions of the jurors.

Even if we were to conclude that the court abused its discretion in concluding that the proffered evidence was not relevant and that it was unduly prejudicial, we nonetheless would conclude that the defendant is not entitled to a new trial. As we stated previously in this opinion, the defendant claims, in part, that the court's improper exclusion of the evidence was an impropriety of constitutional dimension, depriving him of his right to present a defense.[3] Our careful review of the record leads us to conclude that the exclusion of the evidence in question did not deprive the defendant of an opportunity to present a complete defense.

The defendant's position is that, had the evidence been admitted and credited by the jury, it could have supported his claim that the victim was the initial aggressor and, thus, that the defendant had acted in self-defense. The defendant, however, had every opportunity, through his own testimony, to provide ample evidence that the victim was the initial aggressor and that the defendant used the knife under a belief that his life was in jeopardy. Because the defendant was adequately able to present his claim of self-defense by way of his own testimony, by cross-examining the

state's witnesses, and through the opportunity to present any other relevant and admissible evidence with respect to his theory of defense, he is unable to demonstrate that the exclusion of this evidence deprived him of his right to present a defense. See, e.g., *State* v. *Shabazz*, 246 Conn. 746, 758 n.7, 719 A.2d 440 (1998) (no deprivation of constitutional right to present defense when "defendant was adequately permitted to present his claim of self-defense by way of his own testimony, by cross-examining the state's witnesses, and by the opportunity to present any other relevant and admissible evidence bearing on that question"), cert. denied, 525 U.S. 1179, 119 S. Ct. 1116, 143 L. Ed. 2d 111 (1999); see also *State* v. *Thomas*, supra, 110 Conn. App. 718 ("[b]ecause the theory in question provided at most merely one more motivation to attack, its exclusion did not foreclose an entire defense theory and, therefore, did not rise to the level of a constitutional violation"). In the present case, the exclusion of the evidence did not foreclose an entire defense theory, and its exclusion did not give rise to a constitutional violation.

We are left to address the defendant's alternative argument that, even if the court's ruling did not rise to the level of constitutional impropriety, it still constituted harmful evidentiary error warranting a new trial. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [W]hether [an improper ruling] is harmless in a particular case depends [on] a number of factors, such as the importance of the . . . testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the . . . evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Courtney G.*, Conn. , , A.3d (2021).

Even if we were to assume that the court's ruling was erroneous, the defendant has not persuaded us that it substantially affected the verdict. As we stated previously, although the court, on relevancy grounds, excluded some of the evidence that the defendant sought to introduce, the defendant presented ample evidence in support of his defense of self-defense. The state, however, presented a strong case and disproved the defense of self-defense beyond a reasonable doubt.

The defendant testified that he consumed two beers in less than one hour prior to driving home from the restaurant where he was employed. There is no dispute that the defendant and the victim were engaged in a physical altercation and that, during the altercation, the defendant used a knife that he had removed from his automobile. The victim died of a stab wound. There was evidence that, when the defendant called 911 from the scene, but prior to speaking with a dispatcher, he was shouting at and swearing at the victim. At one point, he was shouting, "[h]it me. Hit me . . . ." Although the defendant testified that he swung the knife two times during the physical confrontation, there was evidence that the victim had been stabbed four times, which included the fatal thrust to his heart. There was evidence that, when the defendant spoke to a police dispatcher immediately after leaving the scene, he did not mention being in fear for his life, let alone state that he had used a knife. Moreover, the state presented evidence that, after the defendant left the scene, he concealed the knife in the trunk of his automobile. The state also presented evidence that, when the defendant was asked by the police whether there was a knife in his automobile, and after he observed the police searching the inside of the automobile, he hesitated before replying affirmatively. On the basis of the foregoing, we are not persuaded that the jury's verdict would have been different even if it had before it the precluded evidence that was related to the victim's rearrest status at the time of the accident.

B

Next, the defendant claims that the court improperly excluded a recording of the second 911 call he made after his encounter with the victim. This recording was purportedly made by the defendant after he left the victim and while he was waiting for the police to arrive at the intersection of Lindley Street and Salem Street in Bridgeport. The defendant argues that the recording was admissible under the spontaneous utterance exception to the rule against hearsay. We disagree.

The following additional facts are relevant to this claim. On the first day of the trial, November 27, 2017, the defendant filed a memorandum of law in support of the admissibility of the evidence at issue. He argued that it was admissible under the spontaneous utterance exception to the rule against hearsay; see Conn. Code Evid. § 8-3 (2); under the state of mind exception to the rule against hearsay; see Conn. Code Evid. § 8-3 (4); and as part of the res gestae. Because, in the present claim, the defendant focuses on whether the court improperly determined that the evidence was not admissible under the spontaneous utterance exception, we will focus our attention on the arguments made and the court's ruling only with respect to that theory of admissibility.

In his memorandum of law, the defendant argued: "As the call demonstrates, the defendant's comments, tone and demeanor indisputably exhibit spontaneity, excitement and panic. The time frame was contemporaneous with, and part of, the event. The defendant placed the call to 911, thereby subjecting, knowingly, himself to identification on that recorded police line. The call was made by the defendant, initiated as a victim of the decedent's conduct, with the purpose of obtaining emergency assistance from [the] police. The reported event was certainly startling. In these respects, the defendant's 911 call is indistinguishable from other victim related 911 conversations that are routinely admitted in this state and others."

The following day, defense counsel indicated to the court that the defense intended to introduce the second 911 recording. The state indicated that it objected to the recording. The prosecutor stated that the state did not object to the initial 911 recording, which was admitted in evidence. The prosecutor argued that it was undisputed that the second 911 call, in contrast with the first 911 call, did not reflect spontaneous utterances but "self-serving inadmissible hearsay. . . . It's really a discussion about who you are, what was going on." The prosecutor relied on the undisputed facts surrounding the proffered evidence, namely, that the defendant made the second 911 call one to two minutes after the first 911 call ended, after he had left the scene of the stabbing and while he was waiting for the police to arrive at the intersection of Lindley Street and Salem Street.

Defense counsel argued that the recording was admissible as a spontaneous utterance because it could be interpreted as a continuation of the first 911 call, which was made contemporaneously with the defendant's altercation with the victim on the exit ramp. Defense counsel essentially argued that, when the defendant made the second 911 call, he was still experiencing feelings of panic, nervousness, and upset. After the court reviewed the recording of the second 911 call, it excluded the evidence. The court explained its understanding of what constitutes a spontaneous utterance[4] and then turned to the specific evidence at issue as follows: "[W]e all have discussed and gone through the idea of what a spontaneous utterance is, and while I don't disagree, and counsel has reiterated the idea of it being a startling event, it has to have personal observation, but . . . the whole point of the idea of a spontaneous utterance is that it is deemed to have some level of trustworthiness because it's in a scenario where the individual who is uttering the statement has not had an opportunity to reflect on it or try to elicit a statement that is self-serving or motivated by any idea of being self-serving. . . .

"We've already heard . . . [the recording of the first

911 call]. The [recording of the] second . . . [call] is largely the defendant wondering where the police are and then kind of reiterating to the operator, you know, what his account is. It is self-serving. It is the defendant's own statement. It does not come in as a spontaneous utterance for all of the reasons that I have previously indicated."

Having set forth the court's ruling, we turn to the applicable legal principles. Hearsay is "a statement, other than one made by the declarant while testifying at the proceeding, offered in evidence to establish the truth of the matter asserted." Conn. Code Evid. § 8-1 (3). Generally, hearsay is inadmissible. Conn. Code Evid. § 8-2 (a). Spontaneous utterances are not excluded by the rule against hearsay, even though the declarant is available as a witness. Conn. Code Evid. § 8-3. A spontaneous utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress or excitement caused by the event or condition." Conn. Code Evid. § 8-3 (2). Our Supreme Court has explained that "the spontaneous utterance exception . . . applies to an utterance or declaration that: (1) follows some startling occurrence; (2) refers to the occurrence; (3) is made by one having the opportunity to observe the occurrence; and (4) is made in such close connection to the occurrence and under such circumstances as to negate the opportunity for deliberation and fabrication by the declarant. . . . [T]he ultimate question is whether the utterance was spontaneous and unreflective and made under such circumstances as to indicate absence of opportunity for contrivance and misrepresentation. . . . Whether an utterance is spontaneous and made under circumstances that would preclude contrivance and misrepresentation is a preliminary question of fact to be decided by the trial judge. . . . The trial judge exercises broad discretion in deciding this preliminary question, and that decision will not be reversed on appeal absent an unreasonable exercise of discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Wargo*, 255 Conn. 113, 127–28, 763 A.2d 1 (2000). To be admissible as a spontaneous utterance, "[t]he event or condition must be sufficiently startling so as to produce nervous excitement in the declarant and render [the declarant's] utterances spontaneous and unreflective." (Internal quotation marks omitted.) *State* v. *Kirby*, 280 Conn. 361, 374, 908 A.2d 506 (2006).

In the present case, there appears to be no dispute that the second 911 call followed a startling occurrence, it referred to the occurrence, and it was made by one having the opportunity to observe the occurrence. The point of disagreement between the parties was whether the declaration was made in such close connection to the occurrence as to negate the opportunity for deliberation and fabrication. The court's ruling was based on its determination that the declaration was not made

under circumstances that would preclude contrivance and misrepresentation. As we stated previously, the parties do not dispute the facts relevant to this inquiry, namely, that the defendant made the second 911 call one to two minutes after the first 911 call ended, after he had left the scene of the stabbing, and while he was waiting for the police to arrive at the intersection of Lindley Street and Salem Street.

The defendant's appellate argument is based largely on his belief that, because the second 911 call occurred "only a few minutes after the first [911] call ended," "there is no indication that the statements [in the second call] were anything other than spontaneous" and that the court erroneously excluded the recording. The defendant also argues that the fact that the declaration was a spontaneous utterance undermines the court's characterization of the declarations in the second call as "self-serving." The defendant asserts that relevant statements should not be excluded from the evidence as self-serving if, as here, they fall within an exception to the rule against hearsay.

As this court has stated, "[t]he relation of the utterance in point of time to the . . . occurrence, while an important element to be considered in determining whether there has been opportunity for reflection, is not decisive. . . . Instead, [t]he overarching consideration is whether the declarant made the statement before he or she had the opportunity to undertake a reasoned reflection of the event described therein. . . . [W]e follow the rule embraced by the majority of jurisdictions that have addressed the issue of the effect of the time interval between the startling occurrence and the making of the spontaneous utterance, and conclude that there is no identifiable discrete time interval within which an utterance becomes spontaneous; [e]ach case must be decided on its particular circumstances." (Citation omitted; internal quotation marks omitted.) *State* v. *Dubuisson*, 183 Conn. App. 62, 76, 191 A.3d 229, cert. denied, 330 Conn. 914, 193 A.3d 560 (2018).

Having reviewed the proffered evidence and the undisputed circumstances concerning the making of the second 911 call, we agree with the court's determination that the statements therein did not constitute a spontaneous utterance. The defendant made the call after he had driven away from the scene of his altercation with the victim. It was eminently reasonable to infer that, by this time, the defendant was aware of the seriousness of his predicament and that his statements to the 911 dispatcher could have serious consequences for him. Despite the fact that the second call was made minutes after the first 911 call ended, the facts suggest that the defendant made the second 911 call from a location of relative calm where he no longer expected to encounter the victim, let alone have an opportunity to perceive any material facts related to his altercation with the

victim. As the court observed, in the second 911 call, the defendant, among other things, told the dispatcher that he was still waiting for the police to arrive, asked the dispatcher when the police would arrive, stated that his automobile battery was malfunctioning, and made factual statements concerning his altercation with the victim that were consistent with the statements that he made during his first 911 call. The defendant also expressed his regret that the automobile accident had escalated into a hostile event.[5] On this record, the court reasonably found that the second 911 call was not made in such close connection to the occurrence as to negate the opportunity for deliberation and fabrication and, thus, properly went on to conclude that the statements therein were self-serving and inadmissible hearsay.

Having concluded that the court's evidentiary ruling did not reflect an abuse of discretion, we likewise conclude that the ruling did not infringe on the defendant's right to present a defense. Although the defendant adequately preserved for appellate review his claim of evidentiary error, he did not claim at trial that the exclusion of the evidence infringed on his right to present a defense and seeks extraordinary review of this unpreserved aspect of the claim. As requested by the defendant, we will consider the constitutional aspect of the present claim under the bypass doctrine set forth in *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). Under this familiar doctrine, "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis omitted; footnote omitted.) Id., 239–40. "The first two [*Golding*] requirements involve a determination of whether the claim is reviewable; the second two requirements involve a determination of whether the defendant may prevail." *State* v. *George B.*, 258 Conn. 779, 784, 785 A.2d 573 (2001). Here, the claim is of constitutional magnitude, alleging the deprivation of a constitutional right, and the record is adequate to review the claim because it is based on the evidentiary ruling. The claim fails under *Golding*'s third prong because, in light of our conclusion that the court properly excluded the evidence in applying the rules of evidence, the defendant is unable to demonstrate that a constitutional violation exists and that it deprived him of a fair trial. See, e.g., *State* v. *David N.J.*, supra, 301 Conn. 133.

C

Next, the defendant claims that the court improperly excluded a portion of his videotaped police interview that depicts his reaction upon being informed by the police that the victim had died. The defendant argues that the evidence was admissible under the spontaneous utterance exception to the rule against hearsay. We disagree.

The following additional facts are relevant to this claim. On the third day of trial, November 29, 2017, defense counsel informed the court that the defendant intended to present in evidence a portion of his videotaped statement to the police. Specifically, defense counsel referred to a portion of the recorded interview in which the police informed the defendant that the victim had died. Defense counsel stated that the videotape reflected the defendant's "strong emotional reaction to the receipt of the startling news in relation to the death of [the victim]. And I think that portion of the tape would . . . qualify as excited utterances at that point in time." Defense counsel stated: "I'd simply indicate to the court, in looking at the video, you will hear things like [the defendant] indicating he can't even stand up, his knees are wobbly, he wants [the police] to dial the telephone for him, his emotional reaction, his crying, his indicating a 'no-no-no,' maybe [the police] . . . have to be mistaken, the [victim] was walking back to his car." Defense counsel stated that the defendant's reaction was "unguarded, unprepared, [with] . . . no opportunity to script what then happens . . . ." The state objected on the ground that the defendant's statements constituted self-serving hearsay and did not fall within the spontaneous utterance exception. The prosecutor argued, and it is not in dispute, that the utterances at issue occurred more than six hours after the defendant's altercation with the victim, while the defendant was being interviewed by the police.

After reviewing the portion of the videotape on which the defendant relied, the court stated that a spontaneous utterance that follows a startling event refers to the startling event and is made by one who personally observed the event. The court then stated that a spontaneous utterance had to be made under circumstances suggesting that the declarant lacked an opportunity to reflect on what he stated or to craft a self-serving declaration. The court also stated, "[s]o, in this particular instance . . . it's many hours after the incident occurred. It's a situation in which the defendant is reiterating, basically, what he feels happened. . . . [T]he defense is arguing that the startling event is really [the defendant] being told that the decedent had passed. . . .

"In this instance, it is reflecting back to something that occurred many hours before. In addition, the defendant clearly knows that he is being questioned and is a suspect in a criminal case. He has been giving state-

ments to the police for many hours. He has been advised of his rights, by his own testimony. So, all of that indicia of trustworthiness that would normally apply to a spontaneous utterance are not applicable in this particular scenario." In its ruling, the court discussed and relied on our Supreme Court's analysis of a similar claim in *State* v. *Kelly*, 256 Conn. 23, 59–62, 770 A.2d 908 (2001).

In our analysis of the defendant's claim, we rely on the legal principles set forth in part I B of this opinion, which pertain to the spontaneous utterance exception to the rule against hearsay. The defendant's appellate arguments mirror those that he raised at trial. In particular, he argues that the court improperly considered the startling occurrence to be the defendant's interaction with the victim on the exit ramp. Instead, the defendant argues, "the startling occurrence was [the defendant's] finding out that [the victim] had died when [the] defendant had no idea about the extent of his injuries during the entire interview. . . . [The] [d]efendant should have been able to show that he was genuinely shocked when he learned of it."

Like the trial court, we consider *Kelly* to be instructive and, thus, discuss that case here in some detail. In *Kelly*, the defendant, following his conviction of sexual assault in the first degree, claimed on appeal that the trial court improperly had excluded as hearsay a statement that he made to his father on the night of the assault. *State* v. *Kelly*, supra, 256 Conn. 58–59. The defendant argued that his statement was admissible under the spontaneous utterance exception to the rule against hearsay because he made this statement immediately after being awakened from a sound sleep and confronted with an accusation that he had sexually assaulted the female victim. Id., 59. Our Supreme Court set forth the relevant facts underlying the defendant's claim: "The state filed a motion in limine requesting that the court exclude testimony by Joseph Kelly, the defendant's father, as to a statement made to him by the defendant. The state argued, in its motion in limine, that the defendant's statement was inadmissible hearsay. In response to the state's motion in limine, the defendant argued that this statement was admissible under the excited utterance exception to the hearsay rule, as it was made after the defendant was startled awake from a sound sleep and confronted with the victim's sexual assault allegations.

"The defendant proffered the following evidence. At approximately 1:30 a.m. on February 11, 1986, the defendant's father received a telephone call from the victim's father. During this telephone conversation, the victim's father told . . . Kelly that [Kelly's] son had just sexually assaulted the caller's daughter. Immediately after this telephone conversation . . . Kelly went into the defendant's bedroom and shook him awake. . . . Kelly then told his son that the victim's father had called,

claiming that the defendant had sexually assaulted his daughter. The defendant then allegedly responded, 'Dad, I didn't rape his daughter . . . we had sex.'

"The trial court granted the state's motion in limine to exclude the testimony of . . . Kelly regarding the defendant's statement to him on the night of the assault, because it found that this statement constituted inadmissible hearsay. Subsequently, the trial court also denied the defendant's motion for reconsideration. Specifically, the trial court found that the sexual assault was the startling occurrence and the time that had passed between the assault and the defendant's statement to his father was sufficient to give the defendant an opportunity to fabricate the statement. In addition, the trial court held that even if the startling occurrence had been the defendant's father awakening the defendant from a sound sleep and confronting him with the accusation, the totality of the circumstances—especially that it was a self-serving denial—strongly suggested that the defendant's statement was unreliable and inadmissible." Id., 59–60.

After setting forth applicable legal principles, our Supreme Court stated, "[i]n the present case, the trial court properly determined that, under the totality of the circumstances, the defendant's statement was not spontaneous, but was made with ample time for reasoned reflection . . . . More than one and one-half hours had passed between the time of the sexual assault and the defendant's statement to his father. During this time, the defendant had dropped the victim off at her home, gone to his own home, and gone to bed. The defendant argues that he did not have the opportunity to fabricate a story because he went home and immediately went to sleep. The defendant presented, however, no evidence to that effect. The defendant has not met his burden of proving that he did not have an opportunity to think about and fabricate a story that night after the assault. . . .

"The defendant also argues that the startling occurrence was not the sexual assault, but was the act of being awakened by his father and confronted with an accusation. The excited utterance exception requires, however, that the statement not only immediately follow a startling event, but that it must also relate to that startling occurrence. . . . Even if being awakened by his father was startling to the defendant, the defendant's statement did not relate to being awakened, but to the sexual assault that had occurred more than one and one-half hours earlier. Under the defendant's reasoning, any statements made by a defendant denying an accusation of criminal activity could qualify as an excited utterance and be offered for the truth of the matter asserted therein, namely, that the accused did not commit the offense. This would contravene the excited utterance exception, the purpose of which is to admit

inherently trustworthy statements made in response to a shocking event. . . . In light of the totality of the circumstances the trial court properly determined that in the present case, the defendant's self-serving exculpatory statement was not an excited utterance and therefore the trial court properly excluded the defendant's father's testimony regarding that statement.'' (Citations omitted; internal quotation marks omitted.) Id., 61–62.

Applying the reasoning of *Kelly* to the present claim, we conclude that the trial court properly determined that the statements at issue were not excited utterances. It is undisputed that the defendant made the statements at issue to the police several hours after his violent altercation with the victim. By this point in time, the defendant was well aware that he was a suspect in a criminal case, that he was at police headquarters, and that he was being interviewed by the police in connection with his altercation with the victim. These circumstances reflect that the defendant was aware that any statements concerning the encounter with the victim, including any statements about the victim's physical condition, would likely affect his penal interest. The defendant had a lengthy opportunity to contemplate the seriousness of his predicament and to craft a response that would tend to bolster his version of events and thereby help him avoid prosecution. Thus, the undisputed circumstances amply support a finding that the statements were not spontaneous. Moreover, we note that the defendant's response was self-serving. It was an expression of disbelief by the defendant that the victim had died and, thus, was consistent with his assertions to the police that he did not stab the victim in the chest and that, when he left the exit ramp, the victim was not merely alive but continuing to act in an aggressive manner.

We also reject the defendant's argument that the startling event was his being provided news that the victim had died and not, as the court reasoned, his altercation with the victim. The defendant's reaction to learning of the victim's death was relevant, if at all, to the extent that it shed light on the defendant's altercation with the victim. Stated otherwise, even if the defendant was startled by news of the victim's death, his reaction to this news was relevant to an assessment of his conduct during his altercation with the victim and, specifically, whether he had caused the victim's death. The defendant's expression of disbelief that the victim had died, therefore, is analogous to a denial of culpability in the victim's death. Thus, the court properly considered the startling event to be the altercation that had occurred many hours earlier on the exit ramp.

Considering the totality of the circumstances surrounding the statements at issue, we conclude that the defendant's self-serving statements of disbelief that the

victim had died did not fall under the spontaneous utterance exception to the rule against hearsay and, therefore, the court properly excluded these statements. Having concluded that the court's evidentiary ruling did not reflect an abuse of discretion, we likewise conclude that the ruling did not infringe on the defendant's right to present a defense. Although the defendant adequately preserved for appellate review his claim of evidentiary error, he did not claim at trial that the exclusion of the evidence infringed on his right to present a defense and seeks extraordinary review of the unpreserved claim. As requested by the defendant, we will consider the constitutional aspect of the present claim under the bypass doctrine set forth in *State* v. *Golding*, supra, 213 Conn. 239–40.[6] The record is adequate to review the claim, which is based on the court's evidentiary ruling, and the claim is of constitutional magnitude, alleging the deprivation of a constitutional right. The claim fails under *Golding*'s third prong because, in light of our conclusion that the court properly excluded the evidence in applying the rules of evidence, the defendant is unable to demonstrate that a constitutional violation exists and that it deprived him of a fair trial. See, e.g., *State* v. *David N.J.*, supra, 301 Conn. 133.

## II

Next, the defendant claims that the court misled the jury by instructing it to consider lesser included offenses even if it found in its assessment of a greater offense that the state had failed to disprove the defense of self-defense. Arguing that the court did not properly instruct the jury with respect to the order of its deliberations, the defendant states, "[t]his was simply wrong. Because self-defense is a complete defense, the jurors could not have considered the lesser offenses if they acquitted the defendant of a greater offense on the basis of self-defense. By repeatedly giving this instruction, the court misled the jury about the consequences of a finding that the defendant acted in self-defense. In short, the jury could not have understood the true nature of self-defense and how it shielded the defendant from any criminal liability. His defense was rendered useless, and a new trial is warranted." We disagree.

In its charge, the court instructed the jury in relevant part: "The defendant has been specifically charged with the offense of murder. The very nature of this offense is such that it may include the elements of what are called lesser included crimes. The lesser included crimes that come under murder for purposes of this particular case are as follows: manslaughter in the first degree, manslaughter in the second degree, and criminally negligent homicide.

"Now, under the lesser offense doctrine, if and only if you unanimously find the defendant not guilty of this specifically charged offense, remember, in this case it's murder, you then go on to consider . . . whether the

evidence is sufficient to establish beyond a reasonable doubt that the defendant is guilty of the lesser included offenses. And it begins in that order; the lesser included offense of manslaughter in the first degree and then you would move on to any further lesser included offenses, manslaughter in the second degree, criminally negligent homicide, in accordance with the lesser included offense charge that I'm going to be giving you.

"If you find that the elements of the crime of murder have been proved beyond a reasonable doubt . . . you shall then go on to consider the defense of self-defense . . . . If you unanimously find that the state has disproved beyond a reasonable doubt the defense of self-defense, you must reject that defense and find the defendant guilty. . . .

"If, on the other hand, you unanimously find that the state has not disproved beyond a reasonable doubt the defense of self-defense . . . then, on the strength of that defense alone, you must find the defendant not guilty, despite the fact that you have found the elements of the crime proved beyond a reasonable doubt. And this same analysis will apply to each of the named lesser included offenses should you reach deliberation on those charges."

After providing these instructions with respect to the offenses of murder and manslaughter in the first degree, the court stated, "[s]o you can see that you do the same analysis for each [offense]. You begin with the murder. If you find that the elements have been proved beyond a reasonable doubt, you move to consider self-defense. If you find that they have not been proven and you unanimously find the defendant not guilty of the crime of murder, you move on to manslaughter in the first degree. That's the first lesser included offense, right? If you find that the state has proved beyond a reasonable doubt all of the elements of that lesser included offense of manslaughter in the first degree, you would then go on to consider the defense of self-defense . . . . So, again, it's the same analysis for . . . each of the offenses.

"All right. Now, if you . . . unanimously find the defendant not guilty of the lesser included offense of manslaughter in the first degree, you would then move to consider the second lesser included offense of manslaughter in the second degree.

"The second applicable lesser included offense is manslaughter in the second degree. If you unanimously have found the defendant not guilty of the crime of manslaughter in the first degree, you shall then consider this lesser included offense. Do not consider the lesser included offense until you have unanimously acquitted the defendant of the greater offense, okay?"

After the court delivered these instructions with respect to manslaughter in the second degree, it referred to

self-defense, stating that, if "you unanimously find that the state has not disproved beyond a reasonable doubt at least one of the elements of the defense, or has not proved one of the statutory disqualifications of self-defense, then, on the strength of that defense alone, you must find the defendant not guilty despite the fact that you have found the elements of the crime proved beyond a reasonable doubt.

"If you have unanimously found the defendant not guilty of the crime of manslaughter in the second degree, you shall then consider the lesser offense of criminally negligent homicide. Do not consider the offense unless and until you have unanimously acquitted the defendant of the greater offense."

After the court instructed the jury with respect to criminally negligent homicide, it stated: "If you unanimously find that all of the elements of the crime of criminal negligent homicide have been proved beyond a reasonable doubt, you shall then consider the defense of self-defense . . . . If you unanimously find that the state has disproved beyond a reasonable doubt the defense of self-defense, you must reject the defense and find the defendant guilty of this offense. If, on the other hand, you unanimously find that the state has not disproved beyond a reasonable doubt the defense of self-defense, then, on the strength of the defense alone, you must find the defendant not guilty despite the fact that you have found the elements of the crime proved beyond a reasonable doubt."

The court provided lengthy instructions with respect to the defense of self-defense. The court reminded the jury that the defense applied to the charged offense, murder, and all of the lesser included offenses. The court then emphasized this point and stated: "Now, just as a general summary on your order of your deliberations. If, and only if, you unanimously find the defendant not guilty of the crime specifically charged, which, in this case is, murder, you then go on to consider whether the evidence is sufficient to establish beyond a reasonable doubt the defendant's guilt of the lesser included offenses. You begin with manslaughter in the first degree. . . . So, you only move on to the lesser included offenses if, and only if, you have unanimously found the defendant not guilty of the charged offense of murder, okay?

"If you do find that the state has proven all of the elements of the charged offense of murder . . . you will then go on to further consider the defense of self-defense . . . . So, you . . . unanimously find not guilty of the offense of murder, you move on to the lesser included offense of manslaughter in the first degree. Okay.

"If you found that the state has proven beyond a reasonable doubt all of the elements of the offense of

murder . . . then you move on to consider the defense of self-defense. And that same procedure applies to each and every one of the offenses charged because self-defense applies to each of them.

"So, you begin again with murder, you move on to manslaughter in the first degree. If, in fact, you have unanimously found, after consideration of the first lesser included offense instruction, that the state has failed to prove beyond a reasonable doubt the elements of that first lesser [included offense], manslaughter in the first degree, you would then, and only then, go on to consider the second lesser included offense, which is manslaughter in the second degree. . . .

"Same applies for manslaughter in the second degree. If you have unanimously found not guilty as to that offense . . . you then move on to the criminally negligent homicide. If you found all of the underlying elements proved beyond a reasonable doubt as to manslaughter in the second degree, you would then move on to self-defense. And the same applies, finally, to criminally negligent homicide; that, if you have found that the state has proven all of the elements of the underlying offense, you move on to self-defense and consider the defense of self-defense . . . . If you unanimously find that the state has failed to prove the elements of the crime of . . . criminally negligent homicide, that ends your deliberations there because that is the final lesser included offense, okay. So, I hope that assists you in terms of guiding you in terms of your deliberations."

For the first time, on appeal, the defendant argues that the court's instruction was misleading in that the court suggested, but did not expressly state, that the jury should consider lesser included offenses even after finding that the state failed to disprove beyond a reasonable doubt the defense of self-defense. The defendant presently argues that, "[b]y repeatedly informing the jurors that they should consider the lesser offenses if they acquitted [the] defendant on the greater offenses, thereby suggesting that they do so even if the acquittal was due to the state's failure to disprove the claim of self-defense, the court misled the jurors. Clearly, if they acquitted on the basis of self-defense, then there was no need to consider the lesser offenses. The problem is that [viewed in isolation] . . . the self-defense instructions and instructions about when to consider the lesser offenses were accurate, [but] they became inaccurate when the jury was instructed to consider both of these [instructions]. . . . Here, by telling the jurors it was proper to consider the lesser offenses once there was an acquittal on the greater offense, *and by not specifying* [*that*] *they could do so only if the acquittal was due to the state's failure to prove all the elements of the crime*, the court negated the defendant's entire defense." (Emphasis added.)

The defendant did not preserve the present claim at trial, either by filing a written request to charge that covered the desired instructional language or by taking an exception to the charge on this ground immediately after the charge was delivered.[7] See Practice Book § 42-16 (requirements for preservation of claims of instructional error). The defendant expressly seeks review of the claim under the bypass doctrine set forth in *State v. Golding*, supra, 213 Conn. 239–40.[8] Alternatively, the defendant argues that plain error exists. See Practice Book § 60-5.

We will review the claim under *Golding* because the record affords us an adequate basis on which to review the claim, and the claim is of constitutional magnitude because it implicates the defendant's fundamental due process right to establish a recognized legal defense. See, e.g., *State v. Ash*, 231 Conn. 484, 492–93, 651 A.2d 247 (1994) (defendant has fundamental due process right to proper jury instructions concerning self-defense). We conclude, however, that the claim fails under *Golding*'s third prong because the defendant is unable to demonstrate that a constitutional violation exists and that it deprived him of a fair trial.[9]

"An improper instruction on a defense, like an improper instruction on an element of an offense, is of constitutional dimension. . . . In either instance, [t]he standard of review to be applied to the defendant's constitutional claim is whether it is reasonably possible that the jury was misled. . . . In determining whether it was indeed reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding [it] to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Citations omitted; internal quotation marks omitted.) *State v. Prioleau*, 235 Conn. 274, 284, 664 A.2d 743 (1995).

"[A] legally adequate instruction as to the defense should convey that the effect of a finding that the state has failed to disprove the defense requires the jury to render a verdict in the defendant's favor. The court must unambiguously instruct the jury that it must find the defendant not guilty if it finds that the state has not disproved the defense. . . . A proper self-defense instruction must inform the jury that the defense not only justifies conduct that would otherwise be criminal in nature, but that it is a complete defense in a criminal proceeding." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *State v. Terwilliger*,

105 Conn. App. 219, 235–36, 937 A.2d 735 (2008), aff'd, 294 Conn. 399, 984 A.2d 721 (2009).

We now turn to the charge at issue. As the defendant correctly observes, the court did not instruct the jury that, if it found that the state failed to disprove self-defense beyond a reasonable doubt, such finding with respect to the defense required it to find the defendant not guilty of murder and all of the lesser included offenses at issue in this case. The defendant urges that the lack of such a clear instruction, which would have been legally accurate, made it possible for the jury to conclude that self-defense was not a "complete defense" that applied to each and every lesser included offense, including manslaughter in the second degree. We conclude that this possibility is negated by the fact that the court specifically instructed the jury to consider the defense of self-defense not only with respect to the charged offense, murder, but to the lesser included offenses of manslaughter in the first degree, manslaughter in the second degree, and criminally negligent homicide. Beyond the fact that the court delivered this instruction with respect to the four homicide offenses addressed in its charge, it also unambiguously reiterated at the conclusion of its charge that, if the state had proven all of the essential element of any of the offenses at issue, "you move on to self-defense and consider the defense of self-defense . . . ."

Our interpretation of the likely effect of the charge is not merely informed by our careful review of the court's instructions concerning the jury's order of deliberations and its specific instructions with respect to murder and the lesser included offenses, but by the court's self-defense instruction itself, which followed its instructions with respect to the homicide offenses. In relevant part, the court stated: "Self-defense applies to the charge of murder and all of the lesser included offenses that I've just charged you on; that includes manslaughter in the first degree, manslaughter in the second degree and criminally negligent homicide. And I think you know that by now because, in each of those instances, I told you that you would go on to evaluate self-defense. But remember, it applies to each of them.

"After you have considered all of the evidence in this case, if you find that the state has proved beyond a reasonable doubt each element of a crime to which self-defense applies, you must go on to consider whether or not the defendant acted in self-defense. In this case, again, you must consider the defense in connection with the charged offense of murder, as well as all of the lesser [included offenses]—manslaughter in the first degree, manslaughter in the second degree, and criminally negligent homicide."

The court unambiguously instructed the jury that self-defense was "a compete defense to certain crimes, including murder and the lesser [included offenses],

manslaughter in the first degree, manslaughter in the second degree, and criminally negligent homicide . . . ." The court also stated, "[i]f you unanimously find that the state has failed to prove beyond a reasonable doubt any [of the] elements of the crime to which self-defense applies, you shall then find the defendant not guilty and not consider the defense. If you unanimously find that all of the elements of a crime to which self-defense applies have been proved beyond a reasonable doubt, you shall then consider the defense of self-defense."

Our careful review of the court's charge, in its entirety, leads us to conclude that it is not reasonably possible that it misled the jury in the manner suggested by the defendant. The defendant's interpretation of the charge is belied by the court's repetitive and unambiguous instructions that conveyed the applicability of the defense of self-defense to each and every offense at issue, as well as the legal significance of a finding that the state had failed to disprove the defense. We are satisfied that the charge led the jury to a correct understanding of the fact that self-defense was a complete defense to murder and the lesser included offenses, that it had to evaluate the defense before returning a verdict with respect to any of the offenses, and that a finding that the state failed to disprove the defense required the jury to return a verdict of not guilty. Accordingly, the defendant has failed to demonstrate that a constitutional violation exists and that it deprived him of a fair trial.[10]

### III

Finally, the defendant claims that this court, in the exercise of its supervisory authority over the administration of justice, should require trial courts, in cases in which self-defense is asserted as a defense, to instruct juries to consider the defense prior to considering whether the defendant is guilty of the charged offense and any lesser included offenses. We disagree.

As we discussed in part II of this opinion, the defendant submitted a request to charge in which he asked the court to instruct the jury that it may consider the defense of self-defense *prior* to considering whether the state proved the essential elements of the charged offense, murder, or the three lesser included offenses at issue in this case. See footnote 7 of this opinion. The court denied that request and, as we discussed in part II of this opinion, the defendant attempted to demonstrate that the court's charge possibly misled the jury with respect to the defense of self-defense. In the present claim, the defendant argues that an instruction similar to the one he sought "is warranted to eliminate any confusion about the legal effect of self-defense that stems from instructions, like those given by the trial court [in the present case], that direct the jurors to consider the lesser included offenses in the case of an acquittal." The defendant, correctly observing that a

defendant who acts in self-defense is not guilty of *any* offense to which the defense applies, argues that an instruction requiring juries to consider self-defense at the outset of their deliberations "would streamline deliberations and potentially save judicial resources by cutting down on the amount of time jurors spend deliberating." The defendant also argues that this court should exercise its supervisory powers so that trial courts "avoid confusing jurors about the legal effect of a finding that [a] defendant acted in self-defense, and to prevent unwarranted convictions of lesser included offenses, even though the jurors might have believed a defendant acted in self-defense."

"It is well settled that [a]ppellate courts possess an inherent supervisory authority over the administration of justice. . . . Supervisory powers are exercised to direct trial courts to adopt judicial procedures that will address matters that are of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . Under our supervisory authority, we have adopted rules intended to guide the lower courts in the administration of justice in all aspects of the criminal process. . . . The exercise of our supervisory powers is an extraordinary remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . Indeed, there is no principle that would bar us from exercising our supervisory authority to craft a remedy that might extend beyond the constitutional minimum because articulating a rule of policy and reversing a conviction under our supervisory powers is perfectly in line with the general principle that this court ordinarily invoke[s] [its] supervisory powers to enunciate a rule that is not constitutionally required but that [it] think[s] is preferable as a matter of policy." (Citations omitted; internal quotation marks omitted.) *State* v. *Elson*, 311 Conn. 726, 764–65, 91 A.3d 862 (2014).

We are not persuaded that the exercise of our supervisory powers is warranted in the present case. Setting aside a consideration of the merits of the requested instruction, the defendant has not demonstrated that the absence of the instruction resulted in a constitutional violation in the present case or that there existed a serious risk that his conviction was unjust. The defendant has not established that the procedure followed by the trial court in instructing the jury infringed on the integrity of the trial or the perceived fairness of the judicial system as a whole. Accordingly, we decline to afford the defendant any relief with respect to this claim.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The jury found the defendant not guilty of murder and the lesser included offense of first degree manslaughter. The trial court sentenced the defendant to a term of imprisonment of ten years, execution suspended after seven years, followed by five years of probation.

[2] The original information, summons, and rearrest warrant application set forth a Bridgeport address for the victim. The motion to vacate purportedly filed by the victim reflects the Bridgeport address as crossed out and a new address, in West Haven, handwritten in its place.

[3] As we stated previously, defense counsel argued before the court that the proffered evidence was relevant to the defendant's ability to present his defense of self-defense.

[4] The court discussed the spontaneous utterance rule in the context of ruling on the admissibility of the evidence at issue in this claim as well as the admissibility of statements made by the defendant during his police interview, which the defendant also sought to introduce. We will discuss the latter evidence in part I C of this opinion.

[5] The defendant's own characterization of the second 911 call is that his statements therein "corroborated his account about the incident and, particularly, that [the victim] hit his car and cut him off. It also corroborated his testimony that he was waiting for the police after the incident. Importantly, he even stated to the operator that the whole incident was unnecessary and [that] they could have filed a police report and gone on their way." The defendant also asserts that the recording reflected his "evident shock and nervousness immediately after the incident."

[6] We have set forth the parameters of the *Golding* doctrine in part I B of this opinion.

[7] We note that, in his written request to charge, the defendant asked the court to instruct the jury that, prior to its consideration of the charged offense and any lesser included offenses, it could consider whether the state had disproved beyond a reasonable doubt his defense of self-defense. Thus, the defendant asked the court to instruct the jury in relevant part: "As a practical matter, you can consider the question of self-defense first. If you find that the state has failed to disprove self-defense beyond a reasonable doubt, then you should find the defendant not guilty of murder and all of the other charges of homicide." The defendant argued that "jury consideration of an issue that equally addresses or defeats proof of the other lesser offenses promotes the worthwhile goal of judicial economy and efficiency. Conduct is not criminal if it is permitted or justified by law or statute. The issue of whether the defendant's actions were justified is an element of the state's burden of proof that can be considered before, after, or simultaneous to the various other elements."

During the charge conference, defense counsel asserted that an instruction permitting the jury to consider self-defense prior to considering the elements of the offenses of which he could be found guilty served the interest of judicial economy by avoiding the jury's "wast[ing] a lot of time" considering whether the state satisfied its burden of proof with respect to the essential elements of one or more crimes *if* it ultimately would find that the defendant's conduct was justified. The court declined to deliver this requested instruction. Immediately after the court delivered its charge, defense counsel reiterated his objection to the fact that the court declined to deliver the instruction concerning the "order of deliberations . . . ."

We discuss the defendant's written request to charge here because it is somewhat related to the present claim of instructional error, yet we do not view the request to charge as addressing distinctly the issue raised in present claim. The present claim is not simply limited to an evaluation of whether the court should have instructed the jury to consider self-defense prior to considering the charged offense and any lesser included offenses, but focuses on whether the court's charge misled the jury with respect to how the defense of self-defense, if not disproved beyond a reasonable doubt by the state, relieved the defendant of any criminal liability with respect to any of the homicide charges.

[8] We have set forth the parameters of the *Golding* doctrine in part I B of this opinion.

[9] The state does not argue that the defendant implicitly waived the present claim of instructional error following a review of the court's proposed charge. Nor do we reach such a conclusion on the basis of our independent assessment of the claim under *Golding* and our review of the record. In *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 (2011), our Supreme Court concluded that, "when the trial court provides counsel with a copy of the

proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal." Id., 482–83. The doctrine of implied waiver, when applicable, bars recourse to *Golding*. Id., 467. As we have previously discussed; see footnote 7 of this opinion; following a meaningful opportunity for review of the court's proposed charge, defense counsel repeatedly expressed his dissatisfaction with the fact that the court did not deliver his requested instruction concerning the order of deliberations. Although defense counsel's request to charge and his objections to the charge did not address distinctly the issue raised in the present claim, they nonetheless preclude, for *Kitchens* purposes, a determination by this court that defense counsel affirmatively accepted the instructions proposed or given.

[10] Because we concluded in the context of our *Golding* analysis that the court's instructions were legally correct and that it was not reasonably possible that the court's charge misled the jury in the manner claimed on appeal, this finding undermines the defendant's argument that plain error exists. Accordingly, we reject the defendant's argument that he is entitled to relief under the plain error doctrine.

---